852 So.2d 318 (2003)
A.A., The Father, and R.J., The Mother, Appellants,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
Nos. 4D02-4484, 4D02-4583.
District Court of Appeal of Florida, Fourth District.
July 30, 2003.
Rehearing Denied September 3, 2003.
*319 Frank A. Kreidler, Lake Worth, for appellant A.A., The Father.
Michelle Migdal of Migdal & Migdal, P.A., Boynton Beach, for appellant R.J., The Mother.
Jeffrey Dana Gillen, West Palm Beach, for appellee.
GROSS, J.
We affirm the order terminating parental rights as to four children entered after a four-day trial. We write to address two issues.
Both parents contend that the trial court erroneously refused to order the release of the names and addresses of the two younger children's foster parents. The father's pretrial motion contended that because witnesses at trial would likely testify that the children were in good homes with good foster parents, "the only way the father can refute this testimony is to investigate the foster parents, their home and their neighborhood. Witnesses may be available in their neighborhood to contradict the `good foster home' testimony and/or an inquiry of local law enforcement records may reveal derogatory information and/or potential child abuse.... Regardless of whether or not the foster parents are called as witnesses, they have personal knowledge of the children, their medical situation and their best interests."
At trial, Barbara Barr, the guardian ad litem ("GAL") since November 2001, testified. She stated that she visited three of the children on a regular basis. She felt that the mother had not complied with her case plan, as she did "not have a permanent place to live and she [was] not working." Although the mother was taking parenting classes, she had "not demonstrated her ability to apply them." As an example of her lack of parenting skills, the GAL pointed to the mother's failure to obtain any prenatal care for her most recent child, D.A.[1]
When she met the mother for the first time in November 2001, the GAL told the *320 mother that she needed to visit P.A., her third eldest child for whom she had supervised visitation. The mother did not visit P.A. for three or four months. The GAL noted that P.A. was on medication for asthma three times a day, and that D.A. "[was] a very sick little boy," and needed care twenty-four hours a day, because he frequently stopped breathing and had a very weak immune system.
The GAL felt all four children would be at risk if returned to the parents. She did not believe that the parents had the ability to take care of any of their children:
[D.A.'s] out of the question and I'm not so sure of [P.A.] that it would work out for [him] either. I think the older children would be well benefitted to go to their grandmother. I know she wants to adopt them, but if she can't adopt them, they could be placed as long term relative placement with her. And I think [D.A.] and [P.A.] should stay with the families that they know as their family, their parents.
The GAL stated that when she spoke to the mother at a recent judicial review hearing about employment, the mother remarked that the amount of child support being garnished from her wages was so high that it was not worth it for her to work.
On cross-examination, after the GAL noted that the foster parents taking care of P.A. wanted to adopt him, the father's counsel asked for the names of these people. The Department of Children and Families objected and the trial court deferred ruling. After a recess, the father's counsel renewed his previously filed written motion to compel the Department to disclose the names and addresses of the foster parents, and to declare section 409.175(16), Florida Statutes (2002) unconstitutional. Counsel argued that because of GAL's testimony that the foster parents for P.A. and D.A. were doing a good job taking care of the children, and desired to adopt the children, the parents had the right to interview them, talk to their neighbors, check law enforcement records, and investigate whether in fact they were good people.
The Department noted that under section 39.810, Florida Statutes (2002), when considering the manifest best interests of the children, the trial court was not permitted to make a comparison between the attributes of the parents and those of any people providing a present or potential placement for the children. The Department also argued that public policy concerns should prohibit the disclosure of this information because the parents could then locate these foster parents and harass them. The Department contended that revealing such information would discourage people from becoming foster parents.
The trial court ruled that the Department did not have to reveal the names or addresses of any foster parents. We agree with the trial court.
A petition for termination of parental rights (TPR) must contain facts supporting the allegation that at least one of the grounds listed in section 39.806, Florida Statutes (2002) has been met and that "the manifest best interests of the child, in accordance with s. 39.810, would be served by the granting of the petition." § 39.802(4)(a) & (c), Fla. Stat. (2002). Section 39.810 provides that in a hearing on a TPR petition, "the court shall consider the manifest best interests of the child"; the statute further states that "[t]his consideration shall not include a comparison between the attributes of the parents and those of any persons providing a present or potential placement for the child."
The focus in a termination case is on the deficiencies of a parent that may *321 justify the termination of parental rights. If a ground for termination of parental rights exists under section 39.806, the quoted language from section 39.810 indicates that an evaluation of a foster parent's qualities is not material to the termination decision. The trial court properly ruled that the spotlight of a termination case must be kept on the parents, without being sidetracked onto the foster parents. A termination of parental rights case is not a dissolution case where a court bases its decision for a child's primary residence on statutory factors that require a comparison between the parents. See § 61.13(3), Fla. Stat. (2002).
The legislature's intent to shield foster parents from a termination case is further demonstrated by section 409.175(16). That section excludes the following information from public records disclosure:
the home, business, work, childcare, or school addresses, telephone numbers, social security numbers, birth dates, and photographs of persons who are licensed under this section to be family foster parents and of their spouses, their minor children, and other adult household members; identifying information about such persons in neighbor references; the floor plan of the foster home; and any identifying information about such persons contained in similar sensitive, personal information that is provided to the department by such persons.[2]
Sound public policy supports both section 409.175(16) and the trial court's decision not to require disclosure of the identity of the foster parents to a parent in a termination case. If potential foster parents were aware that their personal information was to be released to parents facing termination of their parental rights, many would be discouraged from taking on this vital public service. If a party to a termination proceeding could investigate, intimidate, and harass the caretakers for the children, foster parents would be chilled from undertaking this service to the detriment of children caught within the process. The parents' interests here were protected through their ability to cross-examine all of the witnesses who testified as to the relationship between the children and the foster parents.
On the second point, both parents contend that the children had no standing through their attorney ad litem to join in the Department's TPR petition or to participate in the TPR trial. We hold that the trial court did not err in allowing the children's attorney to join in and participate in the case at trial.
The parents point to Kingsley v. Kingsley, 623 So.2d 780 (Fla. 5th DCA 1993), to support their argument. However, this case supports the trial court's ruling. In Kingsley, an eleven-year-old boy filed a petition for TPR on his own behalf, and the trial court ultimately terminated his mother's parental rights. Id. at 782-83. The fifth district held that in fact the child did not have the legal capacity to file the TPR petition on his own behalf. Id. at *322 783. However, as also noted by the court, nothing prevented an attorney acting on behalf of the child from initiating a TPR petition. Id. at 784. This holding is consistent with section 39.802(1), which states that "[a]ll proceedings seeking an adjudication to terminate parental rights pursuant to this chapter must be initiated by the filing of an original petition by the department, the guardian ad litem, or any other person who has knowledge of the facts alleged or is informed of them and believes that they are true." See § 39.802(1) (emphasis added).
As interpreted by Kingsley, the phrase "any other person who has knowledge" means "someone who is in a peculiar position so that such knowledge can be reasonably inferred; for example, the judge familiar with the file, the guardian or attorney for the children, neighbors or friends of the parties who, because of their proximity, would be expected to have such knowledge." 623 So.2d at 784 (emphasis added); see also Lupinek v. Firth, 619 So.2d 379 (Fla. 5th DCA 1993) (holding that guardian ad litem legally allowed to file TPR on child's behalf).[3] If an attorney ad litem may initiate a TPR case by filing a petition, the attorney may participate at a TPR trial where the petition is filed by the Department.
AFFIRMED.
FARMER, C.J., and POLEN, J., concur.
NOTES
[1] D.A. was born prematurely as the result of an intrauterine viral infection known as "CMV." Dr. Teresa Watts, a pediatric pulmonologist who treated D.A. since January 25, 2002, testified that the child had to take monthly shots for a respiratory virus, which typically is seen in premature babies. Because of CMV, D.A. has growth retardation, hypotonia [muscle weakness], trouble breathing which requires an apnea monitor, and a small head due to his brain not growing properly. In addition, D.A. had nutritional difficulties and trouble swallowing.

Dr. Watts explained that CMV is generally diagnosed prenatally through a blood test. This would result in the pregnancy being characterized as high-risk and the mother would be referred to a perinatologist, an obstetrician who specializes in high-risk pregnancies. Had this test been done, Dr. Watts said that the mother would have received medicine to help mature the baby's lungs. After an amniocentesis had been performed, the baby may have been delivered early to remove it from infection when born. The baby may have also received an anti-viral agent immediately to help slow the progression of the complications.
Because of his medical problems, D.A. has to be fed a special formula, in a specific position because he feeds so slowly and can only take three or four ounces at a time. D.A. also has to be held for thirty minutes for each feeding, and then thirty minutes after each feeding, every three to four hours, or about six times a day. Unless the parents received the appropriate parenting tools to help D.A. develop his motor skills, he is going to become progressively more mentally retarded. Dr. Watts noted that "a lot of [these problems] could have been prevented. The degree at which he's at right now could have been prevented. It's a tragedy."
[2] The legislature recently amended this statute, to also protect this information from public disclosure for foster parent applicants. Chapter 2003-83, section 3, Laws of Florida states in pertinent part:

The Legislature further finds that it is a public necessity to provide foster parent applicants with the same public records exemption afforded licensed foster parents under s. 409.175(16), Florida Statutes, in order to encourage persons to apply to become licensed foster parents. The public availability of such information regarding foster parent applicants could have a negative, chilling effect on the recruitment of such persons. Accordingly, the public records exemption for such applicant information... is a public necessity for the effective and efficient operation of the foster care program.
[3] The Kingsley court held that the error in allowing the minor child to file a petition on his behalf was rendered harmless, as the foster father, the Department, the guardian ad litem, and the foster mother all appropriately filed TPR petitions as well. See 623 So.2d at 785.